

# NUMBER 13-07-00404-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RICHARD ESPINOSA,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## On appeal from the 319th District Court of
## Nueces County, Texas.

# DISSENTING OPINION

### Before Justices Yañez,  Rodriguez, and Benavides
### Dissenting Opinion by Justice Yañez

The majority concludes that no violation of article 46B.007 of the code of criminal procedure occurred when the jury heard evidence that Espinosa was found competent in a separate and unrelated case.[1]  I respectfully disagree and accordingly, I dissent.

---

[1] *See* TEX. CODE CRIM. PROC. ANN. art. 46B.007 (Vernon 2006).

At trial, the State argued that appellant had a "motive" for his conduct and was, therefore, not insane when the incident occurred. The State relied on two separate but related "motive" theories, both of which involved a prior unrelated alleged offense. First, the State argued that appellant rammed Officer Perez's police car because he was in a "rage"—presumably, at the police—because he had been "arrested" in the prior case. Secondly, the State argued that appellant had been found competent to stand trial in the prior case and was therefore motivated to act in a "bizarre" manner "to somehow influence the competency determination in that case."

## I. THE EVIDENCE

### A. Competency Finding in Prior Case

By his fourth issue, appellant argues that a violation of article 46B.007 of the code of criminal procedure occurred when statements he made during his competency evaluation in the prior case were used against him.[2] As noted, the State's second "motive" theory was that appellant (1) had been found competent to stand trial in the prior case, (2) was facing an upcoming court date in that case, and (3) therefore, had an incentive to behave bizarrely in order to undermine the finding of competency in that case. Outside the presence of the jury, prior to the opening statements, the prosecutor and appellant's counsel discussed the State's theory with the trial court. The prosecutor explained the following to the court:

> Well, I would like to fully open with my entire case, meaning I'm going to obviously talk about the case[-]in[-]chief and the rebuttal to what I anticipate their insanity information will be. But as part of that, I feel that I should be able to tell the jury that we plan to bring them a motive and that I should be able to get into the motive, which is in fact that he was on pretrial bond for a

---

[2] *See id.*

2

case at the time, that he was seeing a pretrial supervision officer, that he had been found competent in that case to stand trial, that he did have a pending trial date in that—in—coming up after the competency. And my theory of what better way to show that you're really not competent to stand trial than to do something completely crazy.

The prosecutor advised the trial court that, in the prior case, appellant had been found competent by Raul Capitaine, M.D., and that a status hearing was scheduled for September. The prosecutor further advised the court,

And like I said, it was not Dr. Kutnick, it was Dr. Capitaine. We can make sure that that's known. We aren't going into any of those facts. I don't intend on admitting any documents from the file, I'm just going to have [the district court clerk] testify to those basic general facts.

Appellant's counsel objected that (1) there was "no relevance" between evidence of the prior case and appellant's insanity defense in the present case, and (2) the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.[3] The trial court overruled appellant's objections and ruled that it would "allow the State to go into the fact that [appellant] was on pretrial supervision for another case, but [would not] let the State identify what the type or degree of offense that was." The court clarified that it would permit a pretrial supervision officer and a court clerk to testify that "there was a pending case at the time in which competency was an issue."

During her opening statement, the prosecutor told the jury that the State's motive was that appellant had "another pending charge" and that Dr. Capitaine had "found [appellant] competent to stand trial in that other case." The prosecutor explained,

The State is going to show you that he had a court date coming up on September 9th. Keep in mind this is August 7th. He had a court date coming up on September 9th. He had been found competent to stand trial,

---

[3] See TEX. R. EVID. 402, 403.

3

so he was looking at going to trial on that case. So what better way to prove that you're not competent than to do something completely crazy, like running into the back of a police car? And we intend to bring you that motive.

During its case-in-chief, the State did not introduce any evidence regarding appellant's competency status in the prior case. After the State rested, the defense's first three witnesses were appellant's father and sister, and Joel Kutnick, M.D., the court-appointed psychiatrist. During its direct examination of Dr. Kutnick, the defense did not make any reference to appellant's competency status in the prior case. However, during the State's cross-examination of Dr. Kutnick, the State elicited the following testimony:

| | |
|---|---|
| Q [Prosecutor]: | Could it also be possible—the State has raised a theory of motive. Could it also be possible that—you know about his other pending case, correct? |
| A [Dr. Kutnick]: | I know some about it, yes. |
| Q: | Could it also be possible that since he had been found competent in that case and was facing a trial in that case[,] that what better way to show somebody you're not competent than to do something completely bizarre and crazy? |
| A: | That's always a possibility. As I said, I also feel—besides him being sick, I also think he is deceptive and manipulative. |

The defense next called its own expert, Robert Lee Jimenez, M.D., a psychiatrist. During its direct examination of Dr. Jimenez, the defense made no reference to appellant's competency status in the prior case.

However, during its cross-examination of Dr. Jimenez, the State elicited the following:

| | |
|---|---|
| Q [Prosecutor]: | Dr. Kutnick—and [defense counsel] has already asked you about this. Dr. Kutnick testified earlier that the most |

4

likely scenario on this was that the defendant knew right from wrong, and the reason was because he believed that this was a rage incident and it was likely possible that he was raging at the officers because of the previous arrest for the previous offense. Couldn't that be it?

A [Dr. Jimenez]: No.

Q: Couldn't that be your pattern you're looking for?

A: No. No. I don't think that's sufficient evidence to substantiate that theory, and I so stated earlier.

Q: Couldn't it also be possible that if he had—as you know there was another pending case. If he had that pending case and he had been found competent to stand trial on that case and he had court dates coming up, isn't the best theory on how to show someone that you really aren't competent is to do something completely lunatic and bizarre and show them, "Hey, look, you were wrong. Don't try me because I'm crazy"?

A: I don't know what the pending case is, how serious it is, what it involves. I really couldn't answer the question unless you gave me the specifics of that case and why it would motivate him to try to pull one over everyone.

Q: Thank you.

Prior to the State's rebuttal case, the following exchange occurred, outside the presence of the jury:

[Defense counsel]: Okay. Judge, in regards to the testimony of the pretrial officer, again I'm going to object under Rules 401, 402, 403, 406. The Court needs to do a balancing test, Judge, before it agrees to allow this testimony in. The reason being is the record will show that at the beginning when this was first argued by the State, they argued that it was necessary to show motive because two things: He had an upcoming trial in September. The record shows, Judge there was no trial setting in September. It was a status conference. That's no where near a trial.

5

They also said that the—and the psychiatrist testified that one of the motives also was—in regards to the police officer that he had recently been arrested by a Corpus Christi police officer. Judge, the record will reflect that the arrest had occurred some 10, 11 months before this incident. So all that argument and theory that was placed on [sic] by the State to move forward and asking this judge to allow this testimony that's 404-B material, or evidence under 404-B, again makes this type of evidence highly, highly prejudicial against my client. It's prejudiced my client the entire trial. I've asked for a mistrial I don't know how many times already for the same reasons that the counsel keeps alluding to this case. And now, Judge, in the evidence before you, you see exactly that there was no pending trial. There was no way that my client could have felt motivated to do on [sic] something that he wasn't even facing, as they claim.

So again, I would renew my objection. And if the Court does intend to allow it in, then it needs to do a balancing test first, articulate that into the record, and then it needs to give—and if it still insists on going forward, Judge, you need to give the jury a limited instruction verbally. And then of course we need to put something in the charge. But again I ask the Court to keep it out, Judge. It's—it's too highly prejudicial and it doesn't fit what the State had argued to begin with. Thank you, Judge.

[the Court]:          All right, [prosecutor], your response.

[Prosecutor]:        It's exactly what the State has argued. We have not committed any fraud on the Court. We told this court that he had a case pending; that is true. We told your Honor that he had been asked to be—his competency to be done by Dr. Capitaine; that was done. He had been found competent to stand trial, and he did have a pending status hearing. As this court knows, we do a status hearing so we can get a trial set after a competency evaluation. So there is nothing wrong with anything the State has said. And what better way to show that you are not competent than to do something crazy.

6

So our motive still holds. Whether or not the case had been committed a year before, three years before or anything, he was facing a status hearing where he knew he was coming to this court to get a hearing set. So there's nothing wrong with that. [Defense counsel] is confusing the issues.

. . . .

[Defense counsel]: By the way, the competency hearing, Judge, I mean, again, that has no relevance. Why are we going to talk about this other competency hearing and that he was found competent there?

[Prosecutor]: Because it's motive, Your Honor.

[the Court]: Okay. The Court will overrule the defense objections, will deny the request for mistrial.

And then Mel [district court clerk], when you testify, you need to make sure that you do not testify as to what the actual case is. Only that there was a case pending.

[Prosecutor]: And not even the degree, right, Judge?

[the Court]: Not even the degree.

[Prosecutor]: There you go.

[the Court]: Just that he had another case pending, that there was a status hearing scheduled for September 9, '05.

[Defense counsel]: That it was not a trial setting then, Judge.

[the Court]: That it was not a trial setting.

[Prosecutor]: She's not going to lie, Judge.

[the Court]: Well, it's a status—right, it's a status hearing.

[Defense counsel]: Yeah, but they don't know what that means.

[the Court]: And that there was—there had been a competency motion filed.

[Prosecutor]: That he was found competent.

7

| [the Court]: | He had been examined by Dr. Capitaine and found competent. |

During its rebuttal, the State presented the testimony of Melinda Molina, clerk of the 319th District Court. Molina testified as to documents contained in Espinosa's file in the prior case. According to Molina, the file showed that, in the prior case, Dr. Raul Capitaine was appointed to determine Espinosa's competency to stand trial. Molina testified that the file reflected that appellant was found competent to stand trial. Molina also stated that the prior case was set for a status hearing on September 9, 2005.

During the defense's rebuttal, it called James Edward Lucas, one of appellant's attorneys in the other pending case. Lucas testified that although there was an indictment in the prior case, he did not believe appellant was under "technical arrest," but rather, was "walked up in civilian clothes" and "obtained a bond." On cross-examination by the State, the prosecutor asked Lucas if "the status hearing was set after we learned that [appellant] was competent to stand trial, so we could get a court date, correct?" Lucas answered, "There was a finding of competency."

On re-direct examination by the defense, the following exchange occurred:

| Q [defense counsel]: | Mr. Lucas, I forgot to ask you this question. You had an issue with Mr. Espinosa's competency, did you not? |
| [Prosecutor]: | Objection. We need to approach. |
| [the Court]: | Well, I'm going to overrule that objection. |
| [Prosecutor]: | Okay. |
| [Lucas]: | Absolutely. Yes, if that answers. |
| Q [defense counsel]: | As his attorney, you know that he has severe mental problems, do you not? |

| A [Lucas]: | Yes. |
| --- | --- |
| Q: | And that's been a big issue on your case also, has it not? |
| A: | Yes. There's been motions filed, there's been records subpoenaed, yes. |
| Q: | I have no more questions, Judge. Thank you. |
| [the Court]: | [Prosecutor]. |

[Re-cross examination by the State]

| [Prosecutor]: | You did have issues on competency, correct? |
| --- | --- |
| A: | Correct. |
| Q: | And the Judge appointed a disinterested court-appointed expert, Dr. Raul Capitaine, on that case, correct? |
| A: | Correct. |
| Q: | And Dr. Raul Capitaine came back and told us that in the summer of that year he was competent to stand trial, correct? |
| A: | There is a report from him. I don't think he ever came into the courtroom, but there is a report of his findings on that case. |
| Q: | That he found him competent? |
| A: | Correct. |
| Q: | Thank you very much. |

Following this testimony, both the State and the defense rested.

## B. The "Rage" Theory

In a separate "motive" theory, the State argued that appellant intentionally rammed

Officer Perez's police car because of his "rage" at the police, which stemmed from his

9

"arrest" in the prior case.[4] A corollary to this argument was that appellant gave various explanations for his conduct, but according to Dr. Kutnick, the "rage" explanation was the only one that "fit the facts."

In her opening statement, the prosecutor told the jury, in relevant part:

And at the end of it, we intend to prove to you that this man knew right from wrong. Not just because of the motive, but Dr. Kutnick is going to tell you when he evaluated this defendant he asked him why he hit the police car. Why did you do it? He gave him three different stories. You guys are going to hear about this. He's going to claim he has a chip in his brain. That some—he's changed his story. He's changed it from the terrorist organizations put it in there, to the State Department put it in there, to Donald Rumsfeld. All different things. He claims to have a chip in his brain.

The first time he talked to Dr. Kutnick, he told Dr. Kutnick that he was speaking to Donald Rumsfeld through the television and his foot automatically went down on the gas and he slammed into the police car, not once but twice. Okay. That's the first one.

Then he tells Dr. Kutnick, "Well, no, no. What it really was was I did slam into the police car. And you know why I slammed into the police car? Because I knew if I slammed into the police car[,] they would arrest me. And if they arrested me, then they would take me to a hospital and they would take the chip out of my brain." That would be very interesting if that had happened. It might even be viable. The problem is, is when he smashed into the police car, Officer Perez is going to tell you guys he never once said anything about, "Please help me. I have a chip in my brain. Take me to the psychiatrist, I need it removed." He never once said anything about that. He never said it to any of the officers, he never said it to Judge Batek who was magistrating him, he never said it to the nurse who was doing the intake on him, he never said it to Dr. Imam, the psychiatrist who was sent to take care of him. So if he wanted this chip out of his brain so much, isn't it amazing he didn't tell anybody?

We do have a third—and obviously, just so you'll know, if you're slamming into a police car and you know you're going to get arrested for it, that clearly shows you know right from wrong if you know you're going to get

---

[4] Although the record contains no documents regarding the prior alleged offense, defense counsel informed the trial court that appellant's "arrest" in that incident occurred ten or eleven months prior to the incident in the present case.

arrested.  So we intend to prove to you that he knew right from wrong if you know if you know you're going to get arrested.  So we intend to prove to you that he knew right from wrong.  Because if you know you're going to slam into a police car and get arrested, it was wrong.

His last explanation to Dr. Kutnick was, "No, no, no, not all that stuff." And by the way, all these different stories happened on one day.  The next story was, "No, no, no, that's not what happened.  What happened was I was angry because I broke up with my girlfriend six months before.  And I was angry, and the police officer was just an innocent victim.  I was just angry and I was driving around and I was just getting angry and I just slammed into him. I was just angry."  And so that's the last thing.  So if that's the case, people with mental illness can definitely be angry too.  Or perhaps as our motive said, perhaps he's angry with the officers for arresting him in the other case that he's facing trial on.  You don't know.

But keep in mind that all those different stories came about when he was talking to Dr. Kutnick on one instance.

 Similarly,  in  his  opening  statement,  Espinosa's  counsel  referred  to  the  several

"motive" theories:

So, is it surprising that people will tell us that Richard Espinosa was normal?  What we think the evidence is going to show you, and that you will see, is that normal people don't, for no reason.  Or for some reason that someone wants to you [sic] believe, just runs into the back of a police officer. And for which motive was it?  You've heard three.  Because he wanted to be arrested?  That makes it wrong from wrong.  Well, what happened to this shouting at the police officer, "Shoot me, M.F.  Shoot me, M.F."  Remember, she used the word very graphically.  "Shoot me, M.F."  Well, did he want to get killed, or did he want to be arrested?

You see why it doesn't make any sense?  And there's also something else in there that Dr. Kutnick said that he told him, is that, well, he wanted to be taken to a hospital.  That's why he knows right from wrong.  Okay. So—and we're going to go—the evidence is going to go through each and every one of these steps.  So he knew right from wrong because he knew that if he hit the police officer—he wanted to be arrested.  Okay, that's fine, if we could stop there. But we can't. Because the State has already told you that the police officer says, "No, he comes charging at me, [saying '] Shoot me, M.F. Shoot me, M.F. [']"  Well, then he doesn't want to be arrested, right?  He wants to be killed.  Okay.

Well, that can't be it because then Dr. Kutnick is going to tell you that

11

he told him he wanted to stop these voices so he knew that if he got arrested and because how sick he is[,] he would be taken to a hospital. You see how the things just don't make sense?

During the State's direct examination of Officer Richard Perez, the prosecutor asked about the "different stories" that Espinosa purportedly told Dr. Kutnick when he evaluated Espinosa:

| Q [the Prosecutor]: | By the way, when he was running at you and telling you, "Kill me, mother ******," and that kind of stuff, did he say anything to you, "Officer, officer, I have a chip in my brain. Please help me"? |
|---|---|
| A [Perez]: | He never mentioned anything like that. |
| Q: | Did he say, "Officer, please take me to a hospital. Donald Rumsfeld and Condoleezza Rice are talking to me. I need to go to a hospital"? |
| A: | No, ma'am. |
| Q: | Did he ever say, "Call the State Department. I need them to get this chip out of my brain." |
| A. | No, ma'am. |

After the State rested, the defense presented appellant's father, Richard R. Espinosa. On cross-examination by the State, the prosecutor questioned the elder Espinosa about appellant's medical records from Dr. Dhar, a family practice physician:[5]

| Q [by Prosecutor]: | And here doesn't it say that when she talks about his review of symptoms, all he told her was that he was anxious and very depressed, right? Didn't say psychotic, didn't say going out and wanting to hit a police officer, did he? Didn't say anything about a chip in his brain? |
|---|---|

---

[5] Dr. Dhar is not further identified in the record.

A [Richard R. Espinosa]: Are we allowed that, the chip in the brain? I thought we couldn't.

Q: Sir, answer my question, please.

A: No.

Q: Okay. So there's nothing in here about your son telling her that he was having out of body experiences, right?

A: That is correct.

Q: There's nothing in here about him telling her, his own treating physician, that he had a chip in his brain, right?

A: It doesn't say that.

Q: There's nothing in there about him needing—him asking her to hospitalize him for psychiatric conditions, right?

A: That's correct.

Q: There's nothing in here about him asking her to please get in touch with the State [D]epartment to take the chip out of his ear, right?

A: That's correct.

Q: It doesn't even say that his ear is hurting from the chip in his brain, does it?

A: It does not say that.

As noted, the defense called Dr. Kutnick as a witness. Dr. Kutnick testified that in his opinion, appellant has schizophrenia but is also consciously deceptive. The defense elicited the following testimony from Dr. Kutnick:

Q [by defense counsel]: For example, when you and I first met—you and I—you accompanied me, or I accompanied you, or we met together to visit with Richard and we

13

|  |  |
|---|---|
|  | met with him at the Nueces County jail; is that correct? |
| A [Dr. Kutnick]: | Yes, that's the first time I met you. |
| Q: | Okay. Would you tell the jury what our conversation was about with Mr. Espinosa that day? |
| A: | Yeah. When I had previously met with Mr. Espinosa he was basically uncooperative, and that's where I thought he was malingering. |
| [Prosecutor]: | Your Honor, we're going to have to approach on this one. |
| [Court]: | All right. |
| (Bench conference) |  |
| [Prosecutor]: | The time he saw him at the jail is where Dr. Kutnick found him incompetent. We're not allowed to go into that. And— |
| [Defense counsel]: | I'm not asking about—I'm just asking about our conversation. |
| [Prosecutor]: | And it's going to wind up going to the competency and that's not supposed to be a part of this. All that's supposed to be a part of this is what's in the insanity evaluation. |
| [the Court]: | What's the relevance to the first day that— |
| [Defense counsel]: | It strayed into Richard's head. He's got all these stories about—his microchip stories about his conversations, his auditory—he went into specific detail with Dr. Kutnick about that, and so it goes straight to the issue of insanity. It has nothing to do with competency— |
| [Prosecutor]: | It was a competency— |
| [Defense counsel]: | —but goes to insanity. |

14

[Prosecutor]:       But it was a competency evaluation.

[Defense counsel]:  That's what it goes to.

[Prosecutor]:       No, it doesn't.

[Defense counsel]:  And I think the jury is entitled to hear that.

[Prosecutor]:       It was from a competency evaluation.

[Defense counsel]:  It goes straight to his sanity.

[Prosecutor]:       Can I finish? It actually was a competency evaluation, and it's very clear that you weren't supposed to get into any competency issues in an insanity case. That's why Dr. Kutnick wrote two separate reports.

If he wants to ask actually ask Dr. Kutnick questions about what he saw at that time, Dr. Kutnick will tell him. But since he's leading him by the nose, he hasn't given him a chance to answer any questions. But it can only go to insanity, not the incompetency evaluation on any evaluation where it was competency. The law is very clear. And he's just asking questions about the hallucinations and he can tell him, but he can't—

[Defense counsel]:  Everything that occurred, Judge, in his conversation with Richard Espinosa led to his decision and his opinion on his sanity. All that is relevant. Let me ask him that question first.

[Prosecutor]:       He can't get into competency, Judge.

[the Court]:        Yeah. Don't get into competency, only the insanity.

[Defense counsel]:  I'm not going to ask him whether or not he evaluated him for competency or anything at all. I just want to know—he's entitled to talk about his conversation with Richard.

[the Court]:        Sure.

15

[Defense counsel]: That's all we're going to talk about. I'm not going to ask him about anything about competency.

[Prosecutor]: The problem is he didn't prep Dr. Kutnick ahead of time to tell him that he can't say, "Oh, yeah, but there was also when I found him insane," or "When I found him incompetent." So he can say something without us knowing because he called my witness and my witness doesn't even know why he's here for him. So he doesn't—we have to at least prep Dr. Kutnick just to where he's going.

[the Court]: Okay. Well, let me send the jury out and you can do that outside the jury's presence, so that nothing comes in that shouldn't come in.

[Prosecutor]: Thank you.

[Defense counsel]: Let me find out, because I didn't hear what she was saying.

[Court]: Okay. All right.

(End of Bench conference)

[the Court]: Members of the jury, would you please go to the jury room for just a minute. It's not going to be but probably a minute or two.

(Jury exits courtroom)

[the Court]: All right.

[Defense counsel]: I'm sorry, Judge. I couldn't hear. She was talking too softly. I didn't hear her objection. What she was—

[the Court]: [Prosecutor].

[Defense counsel]: I'm sorry, [Prosecutor]. I didn't hear you a while ago.

[Prosecutor]: We just need to tell you that while you were

16

gone, since you didn't get any kind of prepping, when he's prepping, he's talking to you about the competency, you know that that [sic] was and the sanity that turned into an incompetency [sic].

[Dr. Kutnick]: Yeah. Right.

[Prosecutor]: Just to make—that he can't get into anything within competency. We just wanted to make sure that you are aware of that.

[Defense counsel]: Yeah. We're not going to talk about the competency at all. Here's what I'm doing—

[Prosecutor]: Your Honor—

[the Court]: Go ahead.

[Defense counsel]: We're going to talk about our conversations with Richard—let me ask, can I just ask him a question.

[the Court]: Sure.

Q [Defense counsel]: Your ultimate opinion is based on all your conversations and everything you've done with Richard, correct?

A [Dr. Kutnick]: Yes, my ultimate.

Q: And all the information you received?

A: Yes.

Q: And all that went to make your final opinion. So that's all we're going to talk about.

[Defense counsel]: That's it, Judge.

[Prosecutor]: I just wanted to make sure because he's starting to get into the competency part and I just wanted to make sure we were clear that we didn't come back and cause a very big problem on an appeal issue, which I feel there's going to be—

17

[Defense counsel]:          Okay.

[Prosecutor]:               Can I please finish, Judge?

[Defense counsel]:          I want to ask you, what is it you're asking me not to ask him?  Because I don't think I'm going to ask that question.

[Prosecutor]:               Just because you're dancing around the competency thing, it just needs to be made clear that you don't get into the competency, because you're getting awfully darn close.  And we're talking about insanity which was at the time that it happened.  And what he was telling Dr. Kutnick, you know, is relevant.  But you're dancing on the incompetency issue.

[Defense counsel]:          Okay.  If I understand it, Judge—I'm not going to ask him, I didn't intend to ask him anything about, "Did you do a competency evaluation," "Do you think he's competent."  No.  All I'm talking about is our conversations with Richard and what Richard said, the different stories, so on and so forth.

[the Court]:                Stick with the facts that would relate to sanity.

[Defense counsel]:          Yes, sir.

[Prosecutor]:               And not competency, right?

[the Court]:                And not competency.

[Defense counsel]:          Got it.

After the jury returned, defense counsel elicited the following testimony from Dr.

Kutnick:

[Dr. Kutnick]: . . .          At first Mr. Espinosa again was being uncooperative, wouldn't particularly answer questions.  And then his attorney said to him, "Would you tell the doctor about Condoleezza Rice," and that was the first time that Richard opened up to me and began telling me that he

18

had a microchip implanted in him when he was in the Navy, that he was able to communicate with Condoleezza Rice and Donald Rumsfeld. . . . And he was able to get messages from them. I then—he then came up with one explanation as to why the charge, and my understanding is that he slammed into a police car twice and then started fighting with the officer. And his explanation to me on that—on that interview was that he was in communication with Condoleezza Rice and Donald Rumsfeld, and that his foot just got stuck on the accelerator and that's why he hit the police car.

I then asked him, "So why did you back up and hit it a second time," and I really got no explanation as to why he had hit it the second time. And then I think I asked him also, "So then why did you start fighting with the police officer," and I got no answer for that.

. . . .

That day we're talking about is on May 24th, of 2006. Okay. Here we go. He told me he was spontaneously talking to Donald Rumsfeld and Tom Rich [sic] and recalls he was driving on SPID, and that somehow Rumsfeld was on a television set on the floor, and there were a bunch of men over the television set.

. . . .

I could accept, okay, you're so caught up in listening to the microchip and all the government officials that he rammed into the car. But it doesn't make sense that you back up and ram into it a second time. That just doesn't compute. And it didn't compute also, then why do you start fighting with the officer? You know. If you hit him once, I could kind of buy that he was so caught up that he wasn't paying attention to traffic. But of course I had the other thing: If he was so caught up in it, why wasn't he ramming into a whole bunch of cars, why just the police

19

officer? So the facts from what he said happened just don't add up. It's—it doesn't—the story doesn't hold together.

. . . .

So as I said, that didn't add up in terms that at least the police offense report, I felt that I wasn't getting the complete story from him, that just—I could buy that he got so caught up in the microchip and listening to the government officials that he just didn't see what you were doing or wasn't paying attention and hit the police officer's car once. But then there's the deliberate action that you got to put it in reverse, back up, put it back and forward. That just didn't make sense, so I thought that this—this may not be an honest explanation as to what happened by the defendant.

Q [Defense counsel]: Okay. Now, Dr. Kutnick, this was in May of '06, correct?

A [Dr. Kutnick]: When I saw him that time?

Q: Right.

A: Yes, it was May 24th of 2006.[6]

Dr. Kutnick testified that when he examined appellant again in December 2006, appellant "came up with a few different explanations," including that he hit the police car to get the officer's attention so he could report the microchip in his brain. According to Dr. Kutnick, this explanation "doesn't compute" because the officers did not report that appellant mentioned the microchip and neither did the jail psychiatrist after appellant was arrested. Dr. Kutnick continued:

---

[6] The record contains an order dated May 26, 2006, noting the trial court's receipt of a report finding appellant incompetent to stand trial. Thus, it seems clear that Dr. Kutnick's examination of appellant on May 24, 2006, was a competency evaluation.

20

Then he started talking a little bit that he was in a rage and angry and that's why he hit the officer's car. Although, I couldn't get him to tell me so why were you angry at the officer, because I specifically asked, "Well, did you think the police implanted the chip in your head," and he denied that. He said that, you know, it was the military or terrorists.

Now, the rage thing. If it's what happened, it sounds like he's in a rage. You know, he hits the officer's car, backs up, hits him again, then gets out and attacks the officer. And he said something about that he was in a rage because he was mad about he had just broken up with his girlfriend a few months ago. And I guess I have to ask can I talk about a previous offense that comes into this?

Following a short bench conference, the jury was excused. Outside the presence of the jury, the prosecutor explained to the court that Dr. Kutnick's theory—which was included in his report—was that appellant's conduct in the August 7 incident "was related to anger toward the police since he had been previously arrested for an alleged rape." After some discussion, the trial court instructed Dr. Kutnick that he could discuss his theory that appellant was angry at the police because of his prior arrest, but could not mention specifics regarding the nature of the alleged prior offense. After the jury returned, Dr. Kutnick explained his theory regarding appellant's conduct:

So, as I'm trying to, as I said, determine if a person is insane, I'm trying to reconstruct the events. One, do they have an illness? Yes, he has an illness that could so confuse him. But did it? And so essentially in the two interviews I had I got three different explanations from him as to what happened. One, his accelerator got stuck on the pedal because he was hearing the government officials. The second explanation was he hit the officer because he wanted to get attention and get this microchip out of my head.

And the—and he also started talking about that he had broken up with his girlfriend and he—this anger was building up in him, the rage. But I also knew from all the documents handed to me that he had previously been arrested a few months ago. And he started talking about this rage. And he also told me that he didn't—he denied that the police officer implanted chips in his head so that the rage didn't come from there, and I began to speculate, well, was he angry at police officers because he got arrested previously and

21

he saw the cop and hit him.

Now, out of those three explanations, at least the facts as I know it, the rage issue makes the most sense. So he hit the officer[,] backed up, hit him again, and then attacked him. That is rage. He doesn't shout to the officer, at least as far as I know, please help me. I have a microchip, you know. Why would you attack the officer if you're saying you want help.

So as I look at that, at least as much as I know about what happened, it's the rage reaction that seems to be—explained the actions of that night and not have anything to do with this microchip.

. . . .

With Mr. Espinosa, the only explanation so far that I know of that fits the facts is the rage, and rage is not—in my opinion, does not mean a person is insane. Now, if it was rage over the police putting the microchip in his head, yeah. But he denies that the police had anything to do with the planting of the micro—and that's why—although I do think he's ill—why I don't think he meets the insanity definition which says that your thinking has to be so distorted by your illness that you do not know that it's wrong.

And he also told me that he hit the police car because he knew he would be arrested, and that of course suggests that he understood that it was wrong. So people can be sick, but they don't necessarily mean [sic] that they're actually insane, according to the definition of the State of Texas.

On cross-examination, Dr. Kutnick restated his "rage" theory, but clarified that he did not know the basis for appellant's rage. Dr. Kutnick stated, "the most likely explanation at this point is he was in a rage. Exactly why he's in a rage, I don't know." He further testified:

So, you know he sees the police car—and I don't think he's told us the truth yet as to why he turned around and hit the police. That's his deception. I don't know why he won't level with us, but I don't think he—we've gotten the true explanation yet as to why he did what he did.

On re-direct examination, Dr. Kutnick restated his opinion that appellant had not been honest in explaining his conduct and that the "true" explanation was unknown:

Q [Defense counsel]:    The bottom line is I think you had said a while

22

|  |  | ago that the true explanation of what happened and why it happened is unknown, correct? |
| --- | --- | --- |
| A [Dr. Kutnick]: |  | Yes. I don't think we understand—I don't think Mr. Espinosa has been exactly honest yet as to why he did what he did. |
| Q: |  | What I've heard you tell this jury is even though based on the—this puzzle and this investigation you put together, you think, your opinion, he was sane, you don't really know? Because nobody is ever going to know? |
| A: |  | From my experience in all of the cases I've done—although—and again, I think he is ill. I think he did it at the time that he knew it was wrong to hit the police officer and fight with him. Exactly why he did it, I still don't understand. Despite his illness, I think he had the ability to understand the what's right and what's wrong. |

The evidence therefore established unequivocally that Dr. Kutnick's theory that appellant's conduct was attributable to his "rage" at the police for his "arrest" in the prior incident had no basis other than Dr. Kutnick's own admitted speculation.

Moreover, Dr. Kutnick's presumption on which his rage theory was based—that appellant was enraged at the sight of the police because the police had arrested him in the prior case—was erroneous. The last witness to testify at trial, during the defense's rebuttal case, was Lucas, one of appellant's attorneys in the prior case.[7] Lucas testified that appellant was "walked up" to the court and "obtained a bond." Specifically, defense

---

[7] In closing argument, defense counsel explained his strategy in delaying Lucas's testimony until the end of the trial:

> But we waited until the last minute to show you because we wanted to see how many people were going to say [that appellant had recently been arrested by the police], to show you he was never, ever arrested by a police officer. He was brought in on that other charge, taken before the Court, posted bond, went home.

23

counsel elicited the following testimony from Lucas:

Q [Defense counsel]: Okay. Now, was Mr. Espinosa arrested by the police in this case, or did something else occur?

A [Lucas]: Well, he was in civilian clothes, so he wasn't under arrest, and had a religious book with him and he was asking me and Keith if he could bring it into the courtroom. So I don't believe he was under—technical arrest, yes. There was an indictment, there was an indictment.

Q: But no police ever came out and got him, handcuffed him to bring him to—

A: He didn't go through the county jail.

Q: How did you-all take care of that?

A: [appellant's counsel] walked him up to the Court when they found out there was an indictment.

Q: Uh-huh.

A: And then he obtained a bond at that time.

Q: And that was it, he was gone?

A: Well, I mean, I think you have to technically go down to the jail still and process. I mean, there's still some—there's this legal fiction of an arrest, but there's not what the common person thinks of custody.

Q: He wasn't arrested out in the street by some police officer, handcuffed, dragged to the Nueces County jail?

A: Not that I know of. I know he was walked up in civilian clothes.

This testimony seriously undermined Dr. Kutnick's theory that appellant's "rage" at the

police was explained by his "arrest." Although the specific circumstances of appellant's

appearance were likely unclear and perhaps confusing to the jury, it is clear that he was

24

not arrested by a police officer.

## II. APPLICABLE LAW

Article 46B.007 of the code of criminal procedure provides as follows:

A statement made by a defendant during an examination or trial on the defendant's incompetency, the testimony of an expert based on that statement, and evidence obtained as a result of that statement may not be admitted in evidence against the defendant in any criminal proceeding, other than at:

(1) a trial on the defendant's incompetency; or

(2) any proceeding at which the defendant first introduces into evidence a statement, testimony, or evidence described by this article.[8]

The court of criminal appeals has explained the purpose and legislative intent of the predecessor statute to article 46B.007[9]:

However, when it comes to prohibiting the admission in evidence at the guilt stage of the trial statements that a defendant made during the examination or hearing on his competency to stand trial, we find that there is a far greater reason why such is prohibited as a matter of law.

In making the determination whether an accused person is legally incompetent to stand trial, i.e., whether he has (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against him, it is extremely important that the defendant should be free to make any statement to the examiner that will enable that person to reach the proper conclusion.  This, of course, will encompass statements by the defendant that might relate to the details of the criminal offense for which he is charged

---

[8] TEX. CODE CRIM. PROC. ANN. art. 46B.007 (Vernon 2006).

[9] Former Texas Code of Criminal Procedure article 46.02, section 3(g) read, "No statement made by the defendant during the examination or hearing on his competency to stand trial may be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding."  Act of June 15, 1977, 65th Leg., R.S., ch. 596, § 1, art. 46.02, § 3(g), 1977 TEX. GEN. LAWS 1458, 1460, *repealed by* Act of May 14, 2003, 78th Leg., R.S., ch. 35, § 15, 2003 TEX. GEN. LAWS 57, 72 (current statute at TEX. CODE CRIM. PROC. ANN. art. 46B.007 (Vernon 2006)).  The current statute, which became effective January 1, 2004, does not contain the term "on the issue of guilt."  The court of criminal appeals had held that affirmative defenses, including the insanity defense, "are issues of guilt."  *Mitten v. State*, 145 S.W.3d 225, 228 (Tex. Crim. App. 2004).

25

with committing; statements about his past life; statements that pertain to any disorders the defendant might be suspected of having; statements about his schooling; statements about his past employment; statements about any military service, etc, any of which might be extremely damaging or incriminating on the issue of the defendant's guilt.

In mandating that "no statement made by the defendant during the examination or hearing on his competency to stand trial may be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding," we believe that it was the intention of the Legislature that without any limitations or restrictions there would be free discussion on the part of the defendant when he is examined to determine his competency to stand trial and that such would occur without any fear on the part of the defendant that any statement that he might make would be used against him at the guilt stage of the trial. A clear reading of the statute makes it obviously clear that it actually amounts to a Legislative grant of use or testimonial immunity to any statement that the defendant might make to the examiner or to any statement that he might make during the hearing.[10]

The erroneous admission of statements made by a defendant during a competency evaluation is not waived for failure to object because the statute is too clear and absolute to be held subject to waiver.[11] However, such an error may be rendered harmless where an appellant confesses to the same facts as were testified to by the State's witness.[12]

"We conduct the harm analysis of statutory errors under Texas Rule of Appellate Procedure 44.2(b), disregarding the error unless it affected appellant's 'substantial rights.'"[13] "To make this determination, appellate courts must decide whether the error had a substantial or injurious affect [sic] on the jury verdict."[14]

---

[10] *Perry v. State*, 703 S.W.2d 668, 672 (Tex. Crim. App. 1986).

[11] *See id.* at 671 (citing *Caballero v. State*, 587 S.W.2d 741 (Tex. Crim. App. 1979)); *see Mitten v. State*, 228 S.W.3d 693, 702 (Tex. App.–Corpus Christi 2005, pet. ref'd) (op. on remand).

[12] *See Perry*, 703 S.W.2d at 671; *Mitten*, 228 S.W.3d at 702.

[13] *Mitten*, 228 S.W.3d at 695; *see also* TEX. R. APP. P. 44.2(b).

[14] *Mitten*, 228 S.W.3d at 696 (quoting *Nonn v. State*, 117 S.W.3d 874, 881 (Tex. Crim. App. 2003)).

26

> In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. The reviewing court might also consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments and even voir dire, if material to appellant's claim.[15]

"Specifically, the reviewing court should consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert."[16] "If the error had no influence or only a slight influence on the verdict, it is harmless."[17] "However, if the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, i.e., as having a substantial and injurious effect or influence in determining the jury's verdict."[18]

## III. DISCUSSION

### A. Competency Finding in Prior Case

The majority concludes that when the jury heard evidence that appellant had been found competent to stand trial in the prior case, no violation of article 46B.007 occurred because the statute only precludes (1) statements made by a defendant during a competency evaluation, (2) expert testimony based on such statements, and (3) evidence obtained as a result of such statements.[19] In other words, admission of the evidence at

---

[15] *Id.* (quoting *Nonn*, 117 S.W.3d at 881).

[16] *Id.*

[17] *Id.*

[18] *Id.* at 697.

[19] *See* TEX. CODE CRIM. PROC. ANN. art. 46B.007.

issue here—the *fact* of appellant's competency status in the prior case—is not prohibited by the statute. In my view, such a narrow reading violates the spirit and intent of the statute.

Here, although the statute prohibited the State from calling Dr. Capitaine to testify regarding his evaluation of appellant and the basis for his finding of competency in the other case, the State was nonetheless able to present through other witnesses (Molina and Lucas) that (1) the file in the prior case contained Dr. Capitaine's report, which (2) explained the basis for his finding that appellant was competent. Thus, the State was able to make an "end run" around the statute. Clearly, Dr. Capitaine's report—and his finding of competency—was based on appellant's statements made during the competency evaluation. As the court of criminal appeals noted in *Perry*, the purpose of the statute is to provide "testimonial immunity" to any statement made by a defendant during a competency evaluation, in order to ensure that any statement made by a defendant cannot be used against him at the guilt stage of a trial.[20]

The statute does not limit the exclusion of the prohibited evidence to evidence obtained *in the same proceeding*. Rather, the statute precludes admission of the prohibited evidence "*in any criminal proceeding*" except for a competency trial and when the defendant introduces such evidence first.[21] Here, appellant did not first introduce evidence of the competency finding in the prior case. The State referenced such evidence initially in its opening statement. Then, the State introduced the evidence at issue: (1) in

---

[20] *See Perry*, 703 S.W.2d at 672.

[21] *See* TEX. CODE CRIM. PROC. ANN. art. 46B.007 (emphasis added).

28

its cross-examination of Dr. Kutnick; (2) in its cross-examination of Dr. Jimenez; (3) during its rebuttal with Molina; and (4) during its cross-examination and redirect with Lucas. I would hold that by permitting the State to tell the jury that Dr. Capitaine's report found appellant competent in the prior case, the trial court allowed a violation of article 46B.007 to occur.

Moreover, I would conclude that the error had a substantial or injurious effect on the jury's verdict and, therefore, was not harmless.[22] The State emphasized the finding of appellant's competency in the prior case by reminding the jury of it repeatedly throughout the trial. In its closing argument, the prosecutor reminded the jury that appellant had been found competent in the prior case and was facing "the probability of a trial." In addition, to bolster its theory that appellant was acting "crazy" to undermine his competency status, the State told the jury that appellant was "looking to go to trial" and "was facing a trial" in the prior case—even though the impending date was only a status hearing and no trial date had been set. Given that we are to treat the error as harmful if we are unsure whether the error affected the outcome,[23] I would hold that the error was harmful. I would therefore reverse the trial court's judgment and remand for a new trial.

## B. The "Rage" Theory

With respect to the "rage" theory—that appellant rammed the police car because of his rage at the police caused by his arrest in the prior case—it is clear that Dr. Kutnick's testimony included statements made by appellant during appellant's competency

---

[22] *See Mitten*, 228 S.W.3d at 696.

[23] *See id.* at 697.

29

evaluation. Dr. Kutnick testified at length as to his conversation with appellant on May 24, 2006, which was a competency evaluation. Dr. Kutnick told the jury that during the May 24, 2006 conversation, appellant told Dr. Kutnick that he had a microchip implanted in his brain, was in communication with Condoleezza Rice and Donald Rumsfeld, and rammed the police car because he was distracted by visual images of Rumsfeld and other government officials. Because this testimony clearly concerns statements made by appellant during his competency evaluation and the testimony of an expert based on those statements, I would conclude that its admission is a clear violation of article 46B.007, unless such testimony was first introduced by appellant.[24]

The jury was first told of appellant's "three different stories," which came from Dr. Kutnick's competency evaluation of appellant, by the State during its opening statement. Thereafter, during the State's direct examination of Officer Perez, the prosecutor alluded to the "different stories" provided by appellant during his competency evaluation by Dr. Kutnick. The prosecutor asked Officer Perez if appellant had mentioned that he had a microchip in his brain and had been communicating with Donald Rumsfeld and Condoleezza Rice. Officer Perez replied that appellant had not. During the State's cross-examination of appellant's father, the prosecutor—in reviewing Dr. Dhar's medical records—asked Mr. Espinosa if those records mentioned that appellant had a chip in his brain. Mr. Espinosa responded, "Are we allowed that, the chip in the brain? I thought we couldn't." Mr. Espinosa's response evidences a better understanding of the admissibility of the evidence than either counsel or the court.

---

[24] *See* TEX. CODE CRIM. PROC. ANN. art. 46B.007.

30

Based on this testimony, I would conclude that the State, not appellant, first introduced appellant's statements made during his competency evaluation and that the admission of such statements therefore violated article 46B.007. However, I would also conclude that the error was rendered harmless when the defense called Dr. Kutnick as a witness and elicited from him testimony concerning statements made by appellant during his competency evaluation.

When defense counsel invited Dr. Kutnick to tell the jury about his conversation with appellant at the jail, the prosecutor objected and outside the presence of the jury, pointed out that the referenced conversation was a competency evaluation which resulted in Dr. Kutnick finding appellant incompetent. The defense argued that the statements were admissible because the jury was entitled to hear about Dr. Kutnick's conversations with appellant. During this exchange, defense counsel told the court that he was not going to specifically ask Dr. Kutnick "whether or not he evaluated [appellant] for competency" and that Dr. Kutnick was entitled to talk about his conversation with appellant. The trial court responded, "Sure." At one point, defense counsel told the court , "I didn't intend to ask [Dr. Kutnick] anything about, 'Did you do a competency evaluation,' 'Do you think he's competent.' No. All I'm talking about is our conversations with Richard and what Richard said, the different stories, so on and so forth." The court responded that defense counsel should stick to the facts relating to sanity, not competency.

I call attention to this exchange because I believe it reflects an erroneous interpretation—by counsel and the court—of article 46B.007. Defense counsel was essentially arguing that Dr. Kutnick could testify as to statements made by appellant during his competency evaluation *as long as the jury was not told that the statements came from*

31

*a competency evaluation*. I do not see any such qualifying language in the statute and do not believe that the purpose of the statute is served by such an interpretation. If, as the court of criminal appeals has explained, the purpose of the statute is to ensure a free discussion during a competency evaluation, without fear by the defendant that his statements may be used against him at trial, such a purpose is undermined if the inadmissible evidence can be rendered admissible by simply not telling the jury that it came from a competency evaluation.[25]

## IV. CONCLUSION

As noted above in Section III. A., I would find that (1) by admitting evidence regarding appellant's competency status in a prior case, the trial court permitted a violation of article 46B.007 to occur; and (2) the error was harmful. Accordingly, I would reverse and remand for a new trial.

_____
LINDA REYNA YAÑEZ,
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
5th day of August, 2010.

---

[25] *See Perry*, 703 S.W.2d at 672.