**Cody Dewayne MITTEN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–00–303–CR.**

Court of Appeals of Texas,
Corpus Christi–Edinburg.

June 30, 2005.

Rehearing En Banc Overruled
Sept. 29, 2005.

Discretionary Review Dismissed
Dec. 7, 2005.

Lane W. Vaughn, Roy G. Romo, Houston, for appellant.

Stephen B. Tyler, Dist. Atty., Michael M. Kelly, Asst. Dist. Atty., Victoria, for appellee.

Before Chief Justice VALDEZ and Justices YAÑEZ and RODRIGUEZ.

## OPINION ON REMAND

Opinion by Justice YAÑEZ.

A jury found appellant, Cody Dewayne Mitten, guilty of capital murder,[1] thereby rejecting his affirmative defense of insanity. The State elected not to seek the death penalty, and the trial court assessed punishment at life imprisonment. In a divided opinion, this Court affirmed the judgment on direct appeal.[2]

In a unanimous *en banc* opinion, however, the Texas Court of Criminal Appeals held that the trial court erred in admitting a statement made by appellant at a state hospital during an incompetency examination.[3] The court of criminal appeals held that the statement, introduced by the State to rebut appellant's insanity defense, was admitted "on the issue of guilt" in violation of section 3(g) of former article 46.02 of the code of criminal procedure.[4]

---

1. Appellant was charged with capital murder pursuant to section 19.03(a)(7)(A) of the Texas Penal Code. *See* TEX. PEN.CODE ANN. § 19.03(a)(7)(A) (Vernon Supp.2005). The indictment alleged that during the same criminal transaction, appellant murdered more than one person: his mother, Candelaria ("Candy") Mitten and Larry Allen Sifford, by stabbing each with a knife.

2. *Mitten v. State*, 79 S.W.3d 751, 756 (Tex. App.-Corpus Christi 2002) (en banc), *vacated and remanded*, 145 S.W.3d 225, 228 (Tex. Crim.App.2004) (en banc). In our opinion dated June 13, 2002, we overruled appellant's six issues and affirmed the trial court's judgment.

3. *Mitten v. State*, 145 S.W.3d 225, 228 (Tex. Crim.App.2004) (en banc).

4. *Id.; see* Act of June 15, 1977, 65th Leg., R.S., ch. 596, § 1, art. 46.02, sec. 3(g), 1977 Tex. Gen. Laws 1458, 1460, *repealed by* Act of May 14, 2003, 78th Leg., R.S., ch. 35, § 15, 2003 Tex. Gen. Laws 57, 72 (current statute at TEX.CODE CRIM. PROC. ANN. art. 46B.007 (Vernon Supp.2004–05)). Former article 46.02,

The court of criminal appeals vacated our judgment and remanded the case to this Court for a harm analysis.[5] We reverse the trial court's judgment and remand for a new trial.

## BACKGROUND

At trial, appellant raised the affirmative defense of insanity. In his fifth issue, appellant argued that the trial court erred in admitting, at the guilt/innocence phase of the trial, a statement he made to John Quinn, Ph.D., then chief forensic psychologist at Vernon State Hospital, in the course of Dr. Quinn's examination of appellant to determine competency. Pursuant to the examination, Dr. Quinn prepared a report and testified at trial on redirect examination by the State regarding the report:

> [Prosecutor]: Now, referring to your report dated 5–22–98, in the same paragraph where we talked earlier about your conclusion or opinion, that, "The patient"—the patient being Cody Mitten—"is evasive and somewhat manipulative," is it true that that statement contains a statement, "He is very interested in being found not guilty by reason of insanity and feels that he will be

quickly released into the community after a few months"?

> [Dr. Quinn]: Yes.

As noted, the court of criminal appeals held that the trial court erred in admitting the statement because it was introduced to rebut appellant's insanity defense and was therefore admitted "on the issue of guilt" in violation of section 3(g) of former article 46.02 of the code of criminal procedure.[6] Having determined that the trial court erred in admitting the statement, we must conduct a harm analysis to determine whether the error calls for a reversal of the judgment.[7]

## HARM ANALYSIS

▮▮▮ We conduct the harm analysis of statutory errors under Texas Rule of Appellate Procedure 44.2(b), disregarding the error unless it affected appellant's "substantial rights." [8] As a general rule, error in the admission or exclusion of evidence does not rise to a constitutional level.[9] With respect to the erroneous admission or exclusion of evidence, constitutional error is presented only if the correct ruling was constitutionally required.[10]

---

section 3(g) of the code of criminal procedure provided: "No statement made by the defendant during the examination or hearing on his competency to stand trial may be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding." The current statute, which became effective January 1, 2004, says that a statement made by a defendant during an examination on competency "may not be admitted in evidence against the defendant in any criminal proceeding." Tex.Code Crim. Proc. Ann. art. 46B.007 (Vernon Supp.2004–05). The term "on the issue of guilt" is not in the new statute. *See id.; Mitten,* 145 S.W.3d at 227–28.

5. *Mitten,* 145 S.W.3d at 228.

6. *Id.*

7. Tex.R.App. P. 44.2.

8. *See Burnett v. State,* 88 S.W.3d 633, 637 (Tex.Crim.App.2002); *see also* Tex.R.App. P. 44.2(b).

9. *Arzaga v. State,* 86 S.W.3d 767, 776 (Tex. App.-El Paso 2002, no pet.); *Reyes v. State,* 69 S.W.3d 725, 742 (Tex.App.-Corpus Christi 2002, pet. ref'd) (noting rule 44.2(b) applicable for error stemming from erroneous admission of extraneous offense evidence); *see Bagheri v. State,* 119 S.W.3d 755, 762–63 (Tex.Crim.App.2003) (quoting *Potier v. State,* 68 S.W.3d 657, 662–63 (Tex.Crim.App.2002) ("Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights. . . .")).

10. *Tate v. State,* 988 S.W.2d 887, 890 (Tex. App.-Austin 1999, pet. ref'd).

At trial, appellant's counsel objected to the admission of Dr. Quinn's testimony on grounds that it constituted a violation of: (1) former article 46.02, section (g) and (2) appellant's rights under the Fifth and Sixth Amendments of the United States Constitution. It is unnecessary, however, for us to determine whether the error was constitutional because even under the less stringent non-constitutional harm standard, we conclude that the error was harmful. Therefore, assuming without deciding, that the error was not constitutional, we conduct a harm analysis under rule 44.2(b).[11]

The issue is whether the error in admitting the evidence of appellant's statement made during his competency examination affected a substantial right.[12] The court of criminal appeals and this Court have set forth the applicable standard:

> Texas Rule of Appellate Procedure 44.2(b) defines the harm analysis to be used when considering "non-constitutional" errors. We have held that, in applying Rule 44.2(b), "an appellate court need only determine whether or not the error affected a substantial right of the defendant. To make this determination, appellate courts must decide whether the error had a substantial or injurious affect (sic) on the jury verdict." We elaborated on this process in *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim.App.2000):

In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. The reviewing court might also consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments and even voir dire, if material to appellant's claim.[13]

 Specifically, the reviewing court should consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert.[14] Evidence of a defendant's guilt, especially if it is overwhelming, is also a factor to be considered in conducting a harm analysis.[15] In determining whether a substantial right was violated, however, the question is not simply whether there was sufficient evidence to support the verdict.[16]

 Neither party has the burden of proof under rule 44.2(b).[17] Rather, the appellate court will examine the record for purposes of determining harm.[18] If the error had no influence or only a slight influence on the verdict, it is harmless.[19]

---

11. See TEX.R.APP. P. 44.2(b).

12. See id.; Nonn v. State, 117 S.W.3d 874, 881 (Tex.Crim.App.2003).

13. Nonn, 117 S.W.3d at 881 (footnotes and internal citations omitted); see Salazar v. State, 118 S.W.3d 880, 882–83 (Tex.App.-Corpus Christi 2003, no pet.) (opinion on remand); Reyes v. State, 69 S.W.3d 725, 742 (Tex.App.-Corpus Christi 2002, pet. ref'd).

14. Bagheri, 119 S.W.3d at 763 (citing Motilla v. State, 78 S.W.3d 352, 356 (Tex.Crim.App. 2002); Solomon v. State, 49 S.W.3d 356, 365 (Tex.Crim.App.2001)).

15. Motilla, 78 S.W.3d at 358.

16. Bagheri, 119 S.W.3d at 763.

17. Reyes, 69 S.W.3d at 742.

18. Id.

19. Id.

However, if the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, i.e., as having a substantial and injurious effect or influence in determining the jury's verdict.[20]

Here, the source of the error was the State. In its rebuttal case, the State called Dr. Quinn to testify regarding his observations of Mitten at Vernon State Hospital during the several months of Mitten's treatment there.[21] Outside the presence of the jury, the prosecutor represented to the court that he had "no intention of asking anything specifically about insanity or this particular witness's opinion about sanity, simply matters addressed in his report that would bear upon the schizophrenia factor and the mental illness." The trial court overruled the defense counsel's objection and allowed the testimony.

The character of the alleged error, as the prosecutor conceded at trial, was to offer evidence to rebut Mitten's insanity defense.[22] Outside the presence of the jury, the prosecutor told the court that the evidence "goes to the issue of manipulation and whether or not the defendant could have been manipulating or feigning or basically, asking to be found this way so that he could avoid responsibility for his actions." Thus, as noted by the court of criminal appeals, the evidence was offered to rebut Mitten's insanity defense and was therefore offered on the issue of his guilt, the central issue in the case.[23]

The State's theory was that Mitten was not insane but rather, in the prosecutor's words, that he was attempting to "beat the rap" by "faking" and "manipulating various people." In support of its contention

that "[t]here has been testimony that the defendant was manipulative," the State identified the testimony elicited on cross-examination from Jeff Janacek, then the officer in charge of the Victoria County Jail, where Mitten was held. On direct examination (by the defense), Janacek testified that during the time Mitten was incarcerated at the jail, he suffered several possible seizures that required medical attention. Janacek also testified that as a result of a self-inflicted neck wound that was viewed as an attempted suicide, Mitten was transferred to the hospital for treatment. On cross-examination, the State introduced evidence from notes maintained by officers at the jail regarding several statements reportedly made by Mitten. One of the "jail notes" reflects that Mitten said to an officer, "I loved my mother to death and I guess I just got jealous." An "incident report" reflects that Mitten said to Dr. Robert Lyman, one of the psychiatrists who conducted a psychiatric evaluation of him, "I don't know what happened that night. I'm not a violent person. You know I loved my mother. I'm not a person—It was like temporary insanity or something." With regard to Mitten's hospitalization following his alleged suicide attempt, the State elicited testimony from Janacek that the incident report reflects that Mitten was behaving well and in good spirits in the hospital. The report also reflects that during his hospitalization, Mitten was allowed special contact visits from his family and that family members were allowed to bring him special home-made food. According to the report, upon being told that there was no need for further hospitalization and that he

---

20. *Id.*

21. After a jury determined Mitten was incompetent, he was transferred to Vernon State Hospital for further examination and treat-

ment with the specific objective of obtaining competency.

22. *See Mitten,* 145 S.W.3d at 227.

23. *Id.* at 228.

would be returned to the jail, Mitten's mood changed dramatically and he asked to see a doctor.

In its rebuttal case, the State also offered the testimony of Dr. David Blanchard, an emergency-room physician at the hospital in Victoria. Dr. Blanchard had examined Mitten early in the evening on the night of the murders, when Candy and Sifford, concerned about Mitten's unusual behavior, brought him to the hospital for examination. Dr. Blanchard testified that there were no indications at that time that Mitten was delusional. He also testified that he saw Mitten again at the emergency room two days later (after Mitten was arrested for the murders) when he was brought to the hospital from his jail cell following a possible seizure. Dr. Blanchard testified that Mitten was not delusional and that he was unable to determine whether Mitten had suffered a seizure. However, he testified that Mitten told him that he had deliberately held his breath and then fallen.

The State also elicited testimony from its own expert witness, Dr. Richard Coons, a psychiatrist, that he did not believe Mitten was being candid regarding his memories of the offense. Dr. Coons testified he had seen Dr. Quinn's report regarding Mitten being evasive and manipulative and agreed that some of Mitten's behavior was consistent with being evasive or manipulative.

We next consider whether the erroneously-admitted statement might have prejudiced the jury's consideration of the other evidence or substantially affected their deliberations.[24] We conclude that Mitten's statement that he "was very interested in being found not guilty by reason of insanity" was highly prejudicial because it is the only direct evidence *from Mitten* arguably supporting the State's theory that he was

feigning mental illness to avoid a guilty verdict. Although the testimony of Janacek and Dr. Blanchard discussed above was offered to support the State's malingering theory, it does not directly address the issue of avoiding a guilty verdict by obtaining a finding of insanity. Accordingly, we conclude that the erroneously-admitted statement likely prejudiced the jury's consideration of the other evidence in the case.

We next address the nature of the evidence supporting the verdict.[25] The evidence supporting the jury's rejection of Mitten's insanity defense is far from overwhelming. We summarize below the most significant evidence both in support of Mitten's insanity defense and the jury's rejection of it.

The State presented the testimony of two expert witnesses, Drs. Quinn and Coons. Dr. Quinn did not conduct an evaluation to determine whether Mitten was legally insane at the time of the offense, and therefore did not offer an opinion on the issue of insanity. As noted, however, Dr. Quinn did conduct a competency evaluation of Mitten. Pursuant to the competency evaluation, he diagnosed Mitten as suffering from a brief psychotic disorder with symptoms consistent with those of schizophrenia. Dr. Quinn concluded, on the basis of several tests, that Mitten was not pretending to be mentally ill, although his report described him as evasive and somewhat manipulative. The report also contained the erroneously-admitted statement that Mitten was very interested in being found not guilty by reason of insanity.

Dr. Coons conducted a court-ordered insanity evaluation of Mitten. He concluded that there was "something wrong" with Mitten, although he was unable to determine if it was schizophrenia or some other

---

24. *See Bagheri,* 119 S.W.3d at 764.

25. *See id.*

mental disorder. Dr. Coons stated he was unable to give an opinion to a reasonable degree of medical probability as to Mitten's sanity at the time of the offense. His report noted there was information suggesting Mitten knew his conduct was wrong. This information included (1) typical family behavior just before the murders; (2) an inference that he was trying to hide his behavior by pulling the phones out of the wall at his mother's house; and (3) Mitten's initial exculpatory oral statement claiming Sifford had stabbed his mother.

The defense presented expert testimony from two psychiatrists, Drs. Gary Aitcheson and Robert Lyman. Dr. Aitcheson testified that he conducted an evaluation to determine whether Mitten was legally insane at the time of the offense. As part of the evaluation, he reviewed, among other things, the psychiatric evaluations of several other doctors, including Drs. Anthony Hempel and Lyman. Dr. Aitcheson testified that he concurred with the conclusion reached by Drs. Hempel and Lyman that Mitten was legally insane at the time of the offense. Dr. Aitcheson testified he also reviewed the report of Dr. Quinn's competency evaluation, which contained Mitten's statement that he was very interested in being found not guilty by reason of insanity. Dr. Aitcheson also testified that he was "convinced within a reasonable degree of medical certainty" that Mitten was not malingering or "faking" his illness. On cross-examination by the State, Dr. Aitcheson confirmed that an incident report from the Victoria County Jail reflected that Mitten had said he resented Sifford for coming between him and his mother.

Dr. Lyman testified he performed a psychiatric evaluation of Mitten to determine if he was competent to stand trial and whether he was legally insane at the time of the offense. He testified that Mitten was suffering from a major mental illness at the time of the offense and did not know the wrongfulness of his actions. Dr. Lyman also testified that Mitten was not faking his illness.

Two San Antonio police officers, Larry DeHaven and Edward Giddings, testified that Mitten initially gave two exculpatory versions of what happened before he admitted killing both victims. Another officer testified that at the police station, when making telephone calls, Mitten wrapped the phone in his shirt as if he did not want to leave his fingerprints on it. Various members of Mitten's family testified regarding instances of his bizarre behavior in the weeks preceding the murders, including delusions that he was the Holy Spirit.

We next address whether the State emphasized the error.[26] After reviewing the record, we conclude that the erroneously-admitted statement was heavily emphasized by the State. The State elicited testimony regarding Mitten's statement from three different witnesses: Drs. Aitcheson, Quinn, and Coons. The first occasion occurred during the State's cross-examination of Dr. Aitcheson, a defense witness. The following exchange occurred:

Q [by prosecutor]: Now, you had indicated in your testimony, sir, with regard to Dr. Quinn, that Dr. Quinn did not find that Cody Mitten was faking or malingering; is that correct, sir?

A [Dr. Aitcheson]: Correct.

Q: And you, again, have read Dr. Quinn's report and you are familiar with that report; is that correct?

A: Yes, it is. (sic)[27]

---

26. *See Bagheri,* 119 S.W.3d at 763.

27. Designation of "(sic)" appears in the reporter's record.

Q: Is it correct that Dr. Quinn in his report states, "The patient is evasive and somewhat manipulative. He is very interested in being found not guilty by reason of insanity and feels he will be quickly released to the community after a period of a few months"?

A: I recall him writing something of that sort, yes.

Two days later, during the State's rebuttal case, the State called Dr. Quinn as a witness. The trial court overruled defense counsel's objection and erroneously allowed Dr. Quinn to testify regarding his report, which contained Mitten's statement.

After Dr. Quinn concluded his testimony, the State called Dr. Coons as a witness. The State elicited the following testimony:

Q [prosecutor]: All right. Now, did you have an opportunity, Doctor, as part of the evaluation process, to review a report by Dr. Quinn, at Vernon State Hospital?

A [Coons]: Yes.

Q: All right. And are you aware of a statement that Dr. Quinn made in his report regarding the defendant, Cody Mitten, being evasive and manipulative?

A: Yes.

Q: Based on your interview with Cody Mitten, did you concur with the feelings that there were some signs of manipulative or evasive behavior?

A: As I stated before, I don't believe he was being square with me about what his full memory was.

Q: All right.

A: And that would be consistent with being evasive or manipulative.

. . . .

Q: All right. And are you also aware, in regard to the report from Dr. Quinn, that the defendant had told Dr. Quinn that he, being the defendant, Cody Mitten, was very interested in being found

not guilty by reason of insanity and felt he would be quickly released into the community after a few months?

A: Yes, sir.

During its closing argument, the State directed the jury's attention to the "real crux of the matter,". Mitten's insanity defense. The prosecutor argued as follows:

[Prosecutor]: . . . Now, let's talk a moment about the testimony of Dr. Quinn. Recall his testimony. Defendant remarks to him during their interview, the defendant was very—Not street legal, not a little bit, but very interested in being found not guilty by reason of insanity and the defendant believed he would be quickly released back into the community. He was evasive and manipulative.

If you recall the testimony from Captain Janacek regarding some of the incidents from the jail, I think it was very clear that the defendant was manipulative. He kept doing things to get himself out of isolation, to the point of trying to make some attempts, perhaps, of trying to take his life. We don't know how legitimate that attempt was. It got him out of the jail and, for the first time, he got contact with his family, special food brought in, homemade enchiladas from his grandmother. His mood was very good, very upbeat.

Then the doctor from Gulf Bend comes in. "Anything you want to tell me, Cody? No, I have nothing to tell you." Then he finds out later that day he's going to be taken back to jail. Guess what happens? His mood changes dramatically. He wants to talk to the doctor from Gulf Bend because he's got something to tell him. Manipulative, ladies and gentlemen. Manipulative.

. . . .

Dr. Coons also testified, ladies and gentlemen, that he had heard and read the comments that the defendant made to Dr. Quinn about being released—about being found not guilty by reason of insanity and about being released back in the community. And you'll recall Dr. Coons is—Remember, he's done thousands of these. He doesn't recall a case where an individual came in and started talking to him about, "The different kind of pleas I can enter in my case," but Cody Mitten did.

. . . .

Please, ladies and gentlemen, don't let him fool you, return a verdict of guilty of capital murder.

The State thus brought the erroneously-admitted statement to the jury's attention three times during the trial and referred to it several times during closing argument. The prosecutor's plea that the jurors not allow themselves to be "fooled" by Mitten's "manipulative" conduct was the last argument the jurors heard before retiring to deliberate. We conclude the State relied heavily on the erroneously-admitted statement.

We must also consider whether the evidence was "elicited from an expert."[28] Here, Mitten's statement was elicited from one of the State's experts, Dr. Quinn. The State compounded the effect of the statement by eliciting testimony from two other experts, Drs. Coons and Aitcheson, that they also had reviewed the statement in Dr. Quinn's report. Moreover, as noted above, the State emphasized in closing that even though Dr. Coons had done "thousands" of psychiatric evaluations, he did not recall any other instance in which a defendant had discussed with him the potential pleas that might be entered.

We next address whether the evidence in question was "cumulative."[29] We do not believe Dr. Quinn's testimony regarding Mitten's statement was cumulative. Although both Drs. Aitcheson and Coons testified regarding the same statement, their testimony derived solely from the fact that they had reviewed Dr. Quinn's report containing the statement. Although the focus of the State's theory was "don't let him fool you," the only other direct evidence supporting the State's manipulation theory was Janacek's testimony suggesting Mitten may have feigned a seizure to obtain the comforts and privileges of being in the hospital and Dr. Blanchard's testimony that Mitten said he deliberately held his breath and fell. The force of Janacek's testimony was tempered somewhat by his testimony on re-direct examination by the defense, in which he confirmed incident reports describing Mitten as sobbing uncontrollably, "nervous and unable to sleep," "at a breaking point," and "banging his head on the cell and yelling that his life had been set in stone and predetermined by a [greater] power." The effect of Mitten's statement that he was "very interested in being found not guilty by reason of insanity and feels that he will be quickly released into the community after a few months" almost certainly tipped the balance in the State's favor.

Finally, we must consider whether admission of the erroneously-admitted statement was rendered harmless because evidence of the same statement was introduced, without objection, through the testimony of Drs. Aitcheson and Coons. We recognize the well-established rule that any error in admitting evidence over a proper objection is harmless if the same evidence is subsequently admitted without objection.[30] More specifically, in the con-

---

**28.** *See Bagheri,* 119 S.W.3d at 763.

**29.** *See id.*

**30.** *Chamberlain v. State,* 998 S.W.2d 230, 235 (Tex.Crim.App.1999).

text of erroneous admission of an appellant's statement made during a competency evaluation in violation of former article 46.02(3)(g) of the code of criminal procedure, the court of criminal appeals has held that such error may be rendered harmless where an appellant confesses to the same facts as were testified to by the State's witness.[31] In *Caballero*, the court of criminal appeals relied on two earlier cases in which it found such error harmless because the appellant had admitted making the statement:

> The admission of the statement was clearly error. Although appellant did not object to the admission of the statement, this Court has held that the error cannot be waived because the statute is too clear and absolute to be held subject to waiver. *Ballard v. State*, 519 S.W.2d 426 (Tex.Cr.App.1975, Opinion on Appellant's Motion for Rehearing). It was pointed out in *Ballard*, however, that "such an error may be rendered harmless, as when the accused admits the making of the statements." In *Smith v. State*, 502 S.W.2d 814 (Tex.Cr.App.1973), cited in *Ballard*, the admission of an incriminating statement made by the defendant during a psychiatric examination was found to be harmless error because the same statements were made in appellant's written confession which was admitted in evidence. In this case, as in

*Smith*, appellant confessed to the same facts as were testified to by the State's witness.[32]

We find the circumstances in the present case distinguishable from those in *Caballero*, *Ballard*,[33] and *Smith*.[34] In *Smith*, the statement at issue was the appellant's statement that he shot his wife and killed her.[35] The appellant subsequently signed a written confession admitting the crime.[36] Similarly, in *Caballero*, the statement at issue was the appellant's statement that he wanted to kill his wife and her boyfriend.[37] The appellant subsequently signed two statements in which he admitted killing his wife.[38]

In the present case, absent Mitten's statement, there was little other evidence to support the State's theory that he was feigning insanity to avoid a guilty verdict. The statement was the strongest evidence supporting the State's theory. Three expert witnesses testified regarding the same erroneously-admitted statement. We conclude that it is very probable that the jury relied heavily on the statement in rejecting Mitten's insanity defense.

Keeping in mind that we should treat the error as harmful if we are unsure whether it affected the outcome,[39] and applying the harm analysis required in rule 44.2(b), we do not have fair assurance that the trial court's error in admitting the

---

31. *Caballero v. State*, 587 S.W.2d 741, 743 (Tex.Crim.App.1979).

32. *Id.*

33. *Ballard v. State*, 519 S.W.2d 426, 429 (Tex.Crim.App.1975). In *Ballard*, a psychiatrist who had examined the defendant was permitted, over objection, to testify at the guilt stage of the trial to statements made by the defendant during the examination which were inconsistent with the defendant's testimony. *Id.* at 428. It was held that such testimony by the psychiatrist was in violation of the express provisions of former article 46.02. *Id.* at 429.

34. *Smith v. State*, 502 S.W.2d 814 (Tex.Crim.App.1973).

35. *Id.* at 815.

36. *Id.* at 816.

37. *Caballero*, 587 S.W.2d at 743.

38. *Id.*

39. *Reyes*, 69 S.W.3d at 742.

evidence had no, or but a slight, effect on the jury's finding of guilt.[40] Accordingly, we hold that the error was harmful and reverse and remand for a new trial.