

# NUMBER 13-22-00484-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI − EDINBURG

JOSE JUNIOR LINCOLN A/K/A
JOSE LINCOLN,                                                      Appellant,

## v.

THE STATE OF TEXAS,                                              Appellee.

### On appeal from the 404th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Justice Benavides**

Appellant Jose Junior Lincoln a/k/a Jose Lincoln was convicted of two counts of
intoxication manslaughter, both second-degree felonies. *See* TEX. PENAL CODE ANN.
§ 49.08(b). A jury sentenced Lincoln to fifteen years' imprisonment for each count, and
the trial court ordered the sentences to run consecutively. By two issues that we have

restructured, Lincoln argues that: (1) the evidence is insufficient to support his convictions; and (2) the trial court erred by allowing extrapolation testimony because it was unreliable. We affirm.

## I. BACKGROUND

At trial, Jeremy Rodriguez testified that he was working as a server at Applebee's on July 13, 2020. An itemized receipt was admitted into evidence and detailed the items purchased by Lincoln's table. Rodriguez testified that, during his shift, Lincoln ordered a "big brewtus" at 3:35 p.m., 3:58 p.m., 4:37 p.m., and 5:30 p.m.[1] Rodriguez testified that Applebee's had a three-drink limit. However, Rodriguez decided to serve him four drinks because Lincoln "wasn't finishing his beers and also, he had food in front of him." Specifically, Rodriguez testified that, at 4:34 p.m., Lincoln ordered a hamburger and fries and the table shared boneless wings. Rodriguez also testified that the table shared spinach artichoke dip at 5:45 p.m. Lincoln closed out his tab with Rodriguez at 5:46 p.m., and Rodriguez testified that Lincoln was not displaying any signs of intoxication when his shift ended.

Anel Benavidez was also a server at Applebee's on July 13, 2020, and took over for Rodriguez when his shift ended. Benavidez testified that Lincoln started a tab with her at 6:11 p.m. According to Benavidez, Lincoln ordered big brewtuses at 7:12 p.m., 7:34 p.m., 8:06 p.m., and 9:28 p.m. Benavidez explained that, although a big brewtus is advertised as containing twenty-five ounces of beer, staff are instructed to underpour the drinks, so "you are looking at about maybe 22 to 23 ounces of beer altogether." Benavidez

---

[1] Testimony at trial indicates that a "big brewtus" is a draft beer served in a 25-ounce mug. Here, Lincoln specifically ordered a Dos Equis "big brewtus."

detailed that Lincoln also attempted to order a ninth big brewtus. She did not believe that Lincoln was intoxicated, but she "didn't want to take that chance," and so she refused him service. Benavidez also testified that Lincoln "wasn't actually finishing the entire glass of beer" and "[h]e seemed fine."[2] Lincoln's table also ordered mozzarella sticks to share, and Benavidez remembered that Lincoln ate, although she could not recount how much he ate. Benavidez testified that Lincoln closed out his tab with her at 9:50 p.m. and left shortly thereafter.

At 10:59 p.m., Detective Joel Avalos of the Harlingen Police Department arrived at the scene of an accident that occurred at 10:58 p.m. at the "900 block of . . . West Tyler" in Cameron County. He described the scene as "chaotic." Detective Avalos observed that it was a two-vehicle collision; one of the vehicles was a gray Ford Explorer and the other was a white Ford F-250. Detective Avalos testified that there were two deceased individuals in the gray Ford Explorer. Shortly thereafter, he spoke with Lincoln, who informed Detective Avalos that he had been operating the white Ford F-250. Detective Avalos noticed two empty 24-ounce Dos Equis beer cans "near the left passenger door of [Lincoln's] vehicle" and two more cans in "[t]he bed of the truck." He also spoke with eye witnesses who relayed that "they observed a white . . . F-250 traveling at [a] high rate of speed eastbound on West Tyler."

At the scene of the accident, Detective Avalos did not observe any signs or clues of intoxication from Lincoln. However, when he later made contact with Lincoln again at the hospital, Detective Avalos observed that Lincoln "had red droopy eyes, [and] he had

---

[2] Benavidez acknowledged that on July 14, 2020, she wrote a statement concerning the events of July 13 in which she did not mention that Lincoln was not finishing his drinks.

3

slurred speech." Lincoln informed Detective Avalos at the hospital that he had not consumed any alcoholic drinks that evening and that he was traveling between 35 and 40 miles per hour at the time of the accident. Lincoln consented to a blood draw at around 12:20 a.m., and Detective Avalos then placed Lincoln under arrest.

Detective Raul Flores of the Harlingen Police Department testified that he interviewed Lincoln on July 15, 2020. According to Detective Flores, Lincoln advised that he was coming from a Taco Bell when the accident occurred. Lincoln explained to Detective Flores that, prior to the accident, "he was eating a burrito and talking to his wife via Bluetooth." A photo was admitted into evidence depicting a burrito on the driver's side floorboard of Lincoln's car. Detective Flores also testified that Lincoln admitted to drinking on the evening of July 13.

Videos taken from outside of local businesses that depict Lincoln's white Ford F-250 traveling eastbound on West Tyler and the eventual accident were also admitted into evidence. Roberto Avendano, the IT Director for the Cameron County District Attorney's Office, testified that he watched the available footage depicting the accident in this case and concluded that Lincoln ran a red light prior to the accident. Joe Gonzalez of the Harlingen Police Department was designated as an expert in accident reconstruction. Gonzalez determined that Lincoln was traveling approximately 85 miles per hour prior to the collision. It is undisputed that the speed limit on that street is 35 miles per hour.

Adam Tucker testified that he was previously employed as a forensic scientist with the Texas Department of Public Safety in Weslaco, Texas. Tucker explained that he received and tested a blood sample purporting to belong to Lincoln that was drawn on

4

July 14, 2020, at 12:26 a.m. According to Tucker, the results indicated that the blood alcohol content (BAC) of the sample was 0.084.

Tucker also testified that, as part of his work surrounding this case, he was asked to perform a retrograde extrapolation, which he explained entails using an individual's confirmed BAC from a blood test to estimate what that individual's BAC may have been at a prior point in time. Over the defense's objection,[3] Tucker testified that if an individual had consumed their final drink at approximately 9:30 p.m. and their BAC was approximately 0.084 at 12:30 a.m., Tucker "would expect the alcohol concentration for an average individual to range from a 0.107 to a 0.122 at 11:00 [p.m.]"

Raul Guajardo, a forensic scientist, was designated as an expert in toxicology without any objection from Lincoln. Guajardo testified that he graduated with a bachelor's degree in chemistry in 1980, and since then, he has testified "hundreds of times and in many counties" and had worked on toxicology-related matters for "42 years." Guajardo testified that he performed a "forward extrapolation" to determine Lincoln's blood alcohol content (BAC) at the time of the accident. According to Guajardo, a forward extrapolation is "the same thing" as other types of extrapolations, like "retrograde extrapolation[s]."

Guajardo used information provided by the State in conducting his analysis. According to Guajardo, he estimated that Lincoln drank approximately 6.75 drinks containing twenty ounces of beer each over the course of the evening, based on the statements that servers were taught to underpour the drinks and that Lincoln was not

---

[3] The defense objected to this testimony on the grounds that it was not relevant and that Tucker should not opine about any of the facts of this case since the defense was not proffered a timely expert report. The trial court overruled the objection but granted the defense a running objection.

finishing his drinks. He testified that he used 190 pounds as Lincoln's weight, and that this was an "important factor." However, he later testified that his calculation could still be accurate without using Lincoln's precise weight. Guajardo discussed the absorption, metabolism, and elimination of alcohol, and discussed different variables that can affect these phases, such as the consumption of food.[4] Guajardo testified that he included the burger and fries that Lincoln consumed in his calculation, but he did not include the various appetizers or the burrito from Taco Bell, as there was not concrete evidence concerning how much Lincoln consumed of those items. Based on the information provided to him, Guajardo's "best scientific estimate" of Lincoln's BAC at the time of the accident was ".106 or .10."

Lincoln was convicted of two counts of intoxication manslaughter and sentenced as described above. This appeal followed.

---

[4] Much of Guajardo's testimony involved a graph that was displayed to the jury but not admitted into evidence. For instance, the following exchange took place:

[State]:      So this graph is a representation of what, sir?

[Guajardo]:   Of the alcohol that was consumed throughout the time that Mr. Lincoln was at Applebee's and for every drink that he had zero [sic] at 3:35, 3:58, 4:47, 5:30, 7:12, 7:34, 8:06 and 9:28.

              Now in between these points there had already been a calculation performed to determine how much alcohol was metabolized. So only the net alcohol is being recorded here as you go up. There's approximate fraction of [sic] a graph here, I am assuming is when there was food consumed. I am not sure but it was somewhere between 5:30 and seven something all the way up to 10:35. This alcohol here is being absorbed and metabolized at the same time. When it gets to the top where all the alcohol is going to be already in the system then it starts metabolizing. Metabolism is—is a straight slope. It's a straight line on a graph that only metabolism is occurring.

              So if you get down over here to .084 and you go back on this line an hour and a half, you go to .106 or .10. That's basically what it shows is the time of the draw, the time of the accident, the delay here and here are the points over here that I used to plot. So, it's the y-axis and the x-axis. Very simple graph.

6

## II.     SUFFICIENCY OF THE EVIDENCE

Lincoln challenges the sufficiency of the evidence to support his conviction for intoxication manslaughter. Specifically, he contends the only evidence tending to show he was intoxicated at the time of the accident was Guajardo's testimony, which he claims is not sufficient.

### A.     Standard of Review & Applicable Law

In conducting a sufficiency review, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in favor of the verdict. *Id.* "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* We consider all the evidence in the record, including evidence that was properly and improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

We measure the sufficiency of the evidence against "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately

7

describes the particular offense for which the defendant was tried. *Id.*

## B.    Analysis

A person commits intoxication manslaughter if that person operates a motor vehicle in a public place and "is intoxicated and by reason of that intoxication causes the death of another by accident or mistake." TEX. PENAL CODE ANN. § 49.08(a). "Intoxicated" is defined as either: (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body" or (2) "having an alcohol concentration of 0.08 or more." *Id.* § 49.01(2). These separate definitions "set forth alternate means by which the State may prove intoxication." *Bagheri v. State*, 119 S.W.3d 755, 762 (Tex. Crim. App. 2003) (emphasis omitted). Both of these definitions were listed in the jury charge, and the indictment merely alleged that Lincoln was intoxicated "by reason of the introduction of alcohol into the body"; it did not specifically allege that Lincoln's BAC was above 0.08 at the time of the accident.

"Circumstantial evidence may prove that a person has lost the normal use of his mental or physical faculties by reason of introduction of a controlled substance or drug into his body." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "Since the definition of 'intoxicated' includes 'not having the normal use of mental or physical faculties,' any sign of impairment in the appellant's ability to speak would be circumstantially relevant to whether he was legally intoxicated while driving." *Griffith v. State*, 55 S.W.3d 598, 601 (Tex. Crim. App. 2001) (quoting TEX. PENAL CODE ANN. § 49.01(2)(A)) (footnotes omitted).

> Other evidence that would logically raise an inference that the defendant
> was intoxicated at the time of driving as well as at the time of the BAC test

includes, *inter alia*, erratic driving, post-driving behavior such as stumbling, swaying, slurring or mumbling words, inability to perform field sobriety tests or follow directions, bloodshot eyes, any admission by the defendant concerning what, when, and how much he had been drinking—in short, any and all of the usual indicia of intoxication.

*Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010).

Here, evidence established that Lincoln ordered 200 ounces of beer at Applebee's between 3:35 p.m. and 9:25 p.m., though there was testimony that staff were instructed to underpour and that Lincoln did not finish the drinks he was served. Additionally, two empty 24-ounce beer cans were found in Lincoln's truck at the time of the accident. *See id.* at 746 (holding that "the presence of vodka bottle caps (but no bottles) in the patrol car" was some supporting evidence of intoxication). Gonzalez testified that he estimated Lincoln was traveling approximately 85 miles per hour prior to the accident on a road that had a speed limit of 35 miles per hour. *See id.* (concluding that "appellant's driving almost 20 m.p.h. over the speed limit prior to the accident" was some supporting evidence indicating intoxication). There was also testimony that Lincoln ran a red light immediately prior to the accident. *See Ubesie v. State*, 379 S.W.3d 371, 376 (Tex. App.—Amarillo 2012, no pet.) ("Circumstantial evidence of intoxication may also be shown by the manner in which an appellant managed his vehicle."); *Williams v. State*, 307 S.W.3d 862, 866 (Tex. App.—Fort Worth 2010, no pet.) ("Regarding the impairment definition of 'intoxicated,' the evidence at trial demonstrated that Williams ran a red light and changed lanes several times without signaling."). And when Detective Avalos made contact with Lincoln at the hospital, he noticed that Lincoln "had red droopy eyes, [and] he had slurred speech." *See id.* (holding that "behavior consistent with intoxication" at the hospital was

9

some supporting evidence of intoxication).

Further, Lincoln had a BAC of 0.084 approximately ninety minutes after the accident. *See id.* at 745 ("BAC-test results, even absent expert retrograde extrapolation testimony, are often highly probative to prove both per se and impairment intoxication."). Additionally, Guajardo's testimony that Lincoln possibly had a BAC of approximately 0.10 at 11:00 p.m., as well as Tucker's similar testimony, whether properly admitted or not, are additional evidence of Lincoln's intoxicated state at the time of the accident. *See Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006) ("[A] reviewing court is permitted to consider all evidence in the trial-court record, whether admissible or inadmissible when making a legal-sufficiency determination."). Finally, Lincoln admitted to Detective Flores that he had been drinking that evening. *See Simmons v. State*, 672 S.W.3d 821, 826 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.) (considering a defendant's admission that he "consumed multiple beverages in the hours leading up to the accident" when reviewing the sufficiency of the evidence to prove intoxication).

In viewing this evidence in the light most favorable to the jury's verdict, we conclude that it was sufficient to prove beyond a reasonable doubt that Lincoln was intoxicated at the time of the accident. We therefore overrule Lincoln's first issue.

### III.     ADMISSION OF EXTRAPOLATION TESTIMONY

By his second issue, Lincoln contends that the trial court erred by permitting Guajardo's testimony extrapolating Lincoln's BAC at the time of the accident because: (1) Guajardo's testimony failed to meet the test set forth in *Mata v. State*, 46 S.W.3d 902 (Tex. Crim. App. 2001); and (2) the burden of proof for the admission of expert testimony

in this case violated Lincoln's constitutional rights.

## A.      Standard of Review & Applicable Law

A witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. "The proponent of scientific evidence must show the court, by clear and convincing evidence, that the evidence is reliable." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008). "To show reliability, three criteria must be met: (1) the underlying theory is valid; (2) the technique applying said theory is valid; and (3) the technique was properly applied on the occasion in question." *Id.*

> Factors that could affect a trial court's determination of reliability include, *but are not limited to*, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

Generally, a trial court's decision "to admit or exclude evidence will not be reversed absent an abuse of discretion." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). "Under this standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the 'zone of reasonable disagreement.'" *Id.* (quoting

11

*McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007)). We review the evidence presented in the light most favorable to the trial court's decision to admit or exclude the expert testimony. *Kelly*, 824 S.W.2d at 574.

If we conclude that the trial court erred by admitting expert testimony, we review the record for harm. *See* TEX. R. APP. P. 44.2(b) (providing that any non-constitutional error "that does not affect substantial rights must be disregarded"); *see also Bagheri*, 119 S.W.3d at 762–63 ("The erroneous admission of the extrapolation testimony in this case did not rise to the level of constitutional error."); *Castor v. State*, No. 13-10-00543-CR, 2011 WL 5999602, at *4 (Tex. App.—Corpus Christi–Edinburg Nov. 30, 2011, no pet.) (mem. op., not designated for publication) ("The erroneous admission of retrograde extrapolation is non-constitutional error subject to a harm analysis."). In determining whether an appellant was harmed by the erroneous admission of expert testimony, "the reviewing court should consider the entire record . . . including testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire if applicable." *Bagheri*, 119 S.W.3d at 763.

A criminal defendant has the constitutional right to a "meaningful opportunity to present a complete defense." *See* U.S. CONST. amends. VI, XIV; *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009). However, "[e]rroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense." *Potier v. State*, 68 S.W.3d 657, 662 (Tex. Crim. App. 2002). "With respect to the erroneous admission or exclusion of evidence, constitutional error is presented only if the correct ruling was constitutionally required." *Mitten v. State*, 228 S.W.3d 693, 695

12

(Tex. App.—Corpus Christi–Edinburg 2005, pet. dism'd).

**B.    Analysis**

**1.    Admission of Expert Testimony**

Lincoln contends, with no citation to the record, that trial counsel "objected to the expert testimony, under the rules of evidence, as unreliable." This assertion is belied by our examination of the record. Lincoln objected multiple times during Guajardo's testimony to leading questions, questions requiring speculation, sidebar comments, and questions already asked and answered. Lincoln also filed a motion to suppress, which the trial court denied, arguing that the blood draw administered at the hospital was performed without probable cause. However, Lincoln did not object to the reliability or the relevance of the scientific testimony proffered by Guajardo. *See* TEX. R. APP. P. 33.1; *Urquhart v. State*, 128 S.W.3d 701, 707 (Tex. App.—El Paso 2003, pet. ref'd) ("In *Mata*, the grounds for objection to the retrograde extrapolation was 'not reliable.' . . . We believe the proper objection here was also that the basis of the opinion was not reliable."). Indeed, Guajardo was designated as an expert in toxicology without any objection from the defense.[5]

Nonetheless, the court of criminal appeals has "repeatedly rejected" requiring hyper-technical objections to preserve error. *See Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013); *Bekendem v. State*, 441 S.W.3d 295, 301 (Tex. Crim. App. 2014); *cf. Veliz v. State*, 474 S.W.3d 354, 358 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd)

---

[5] Generally, "the proponent of novel scientific evidence must prove to the trial court, by clear and convincing evidence and *outside the presence of the jury*, that the proffered evidence is relevant." *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (emphasis added). Guajardo only ever testified in front of the jury, and there was no separate hearing on the admissibility of "forward extrapolation" evidence.

(holding that a single objection to retrograde testimony was sufficient to preserve error without specifying the grounds for the objection). Although Lincoln did not object to designating Guajardo as an expert witness on toxicology, he did object multiple times to Guajardo's testimony on the basis that Guajardo lacked personal knowledge. Rule of Evidence 703 authorizes an expert to base their "opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." TEX. R. EVID. 703. And "before admitting expert testimony, the trial court must be satisfied that . . . the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education." *Jessop v. State*, 368 S.W.3d 653, 670 (Tex. App.—Austin 2012, no pet.). *But see Allison v. State*, 666 S.W.3d 750, 759 (Tex. Crim. App. 2023) ("[T]he requirement of personal knowledge does not apply to expert witnesses whose opinions and conclusions are reasonably based on facts or data generally relied upon by experts in the particular field."), *cert. denied*, 144 S.Ct. 245 (U.S. Oct. 2, 2023). We will assume without deciding that Lincoln's objections to Guajardo's testimony on the basis that he lacked personal knowledge were sufficient to preserve the issue he raises on appeal.

But even if this issue was preserved, Lincoln's argument still fails. *Mata* was the seminal case in which the court of criminal appeals held that "the science of retrograde extrapolation can be reliable in a given case." 46 S.W.3d at 916. "Retrograde extrapolation is the computation back in time of the [BAC]—that is, the estimation of the [BAC] at the time of driving based on a test result from some later time." *Id.* at 908–09.

Here, Guajardo testified that retrograde extrapolation and forward extrapolation were essentially "the same thing." Instead of using the blood test results as the starting

14

point for calculations and working his way back in time like one would for a retrograde extrapolation, Guajardo used the first alcoholic drink Lincoln consumed as the starting point and worked his way forward in time, confirming the accuracy of his calculations by comparing them to the later-obtained blood test results.

Because Guajardo testified that retrograde extrapolation and forward extrapolation were "the same thing," we find the following test outlined in *Mata* instructive:

> The expert's ability to apply the science and explain it with clarity to the court is a paramount consideration. In addition, the expert must demonstrate some understanding of the difficulties associated with a retrograde extrapolation. He must demonstrate an awareness of the subtleties of the science and the risks inherent in any extrapolation. Finally, he must be able to clearly and consistently apply the science.

> The court evaluating the reliability of a retrograde extrapolation should also consider (a) the length of time between the offense and the test(s) administered; (b) the number of tests given and the length of time between each test; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking.

> Obviously, not every single personal fact about the defendant must be known to the expert in order to produce an extrapolation with the appropriate level of reliability. . . . If the State had more than one test, each test a reasonable length of time apart, and the first test w[as] conducted within a reasonable time from the offense, then an expert could potentially create a reliable estimate of the defendant's BAC with limited knowledge of personal characteristics and behaviors. In contrast, a single test conducted some time after the offense could result in a reliable extrapolation only if the expert had knowledge of many personal characteristics and behaviors of the defendant. Somewhere in the middle might fall a case in which there was a single test a reasonable length of time from the driving, and two or three personal characteristics of the defendant were known to the expert.

15

*Id.* at 916–17.

Guajardo was able to clearly explain the science underlying his extrapolation. He explained that the metabolic rates for individuals are different and that "[p]eople metabolize anywhere from .01 grams of alcohol per hundred milliliters of blood per hour up to .022 grams of alcohol per hundred milliliters of blood per hour." However, he explained that "most experts that I know of and most experts in literature, they use 0.015 grams per hundred m[illiliters] of [blood] per hour," which is what he used in this case. This is consistent with the "generally-accepted elimination rate" set forth in *Mata*: 0.015. *See id.* at 914. Guajardo discussed the time it takes to absorb alcohol on a full or empty stomach. He also detailed the variables that were taken into account in his extrapolation, such as Guajardo's gender, his weight, what and when food was consumed, the amount and type of alcohol consumed, and the time of the final drink. Thus, we conclude that Guajardo sufficiently explained the underlying scientific theory and how it was applied in this case. *See Morris v. State*, 214 S.W.3d 159, 179 (Tex. App.—Beaumont 2007), *aff'd on other grounds*, 301 S.W.3d 281 (Tex. Crim. App. 2009).

Guajardo was also aware of the difficulties surrounding extrapolations. He explained that "retrogrades are controversial because we don't know what the metabolic rate is," and the science used is not definitive. Guajardo emphasized that his belief that Lincoln's BAC at the time of the accident was 0.10 was "the best scientific estimate," not a conclusive fact. Guajardo acknowledged that many experts "don't like retrogrades," but in his opinion, "as long as we have all the information, . . . we can do them." Guajardo also acknowledged that his calculation depended on accurate information. Thus,

Guajardo "demonstrate[d] an awareness of the subtleties of the science and the risks inherent in any extrapolation." *See Mata*, 46 S.W.3d at 916; *Corley v. State*, 541 S.W.3d 265, 270 (Tex. App.—Houston 14th Dist.] 2017, no pet.).

The court of criminal appeals did not specify in *Mata* what "a reasonable length of time from the driving" means in the context of either conducting a blood or breath test. *See* 46 S.W.3d at 916. But in a later case, the Court noted that "research indicates that a blood test can be reliable" for purposes of retrograde extrapolation "if taken within two hours of driving." *Bigon*, 252 S.W.3d at 368. Here, the blood test was administered approximately ninety minutes after the accident occurred. *See id.*; *Mata*, 46 S.W.3d at 916–17. Because of this, we conclude that this case falls "in the middle," as the *Mata* Court put it, and Guajardo was only required to demonstrate knowledge of "two or three personal characteristics" of Lincoln to show reliability. *See Mata*, 46 S.W.3d at 916–17.

Guajardo estimated Lincoln consumed "6.75 beers" of approximately "20 ounces" each, based on the testimony that servers underpoured the drinks and that Lincoln did not fully consume the drinks he ordered. While Lincoln disputes this calculation, we view the evidence in the light most favorable to the trial court's decision to allow the expert testimony. *See Kelly*, 824 S.W.2d at 574. Guajardo estimated that Lincoln drank 135 ounces of beer. Based on the evidence presented at trial and reviewed above, we cannot conclude that his estimation was incorrect.

In his analysis, Guajardo also considered the burger and fries that Lincoln consumed. Lincoln urges that this was not sufficient as there was testimony that Lincoln also partook in some of the shared appetizers the table ordered, and that he consumed

a burrito from Taco Bell. Although there is testimony that Lincoln ate some of the appetizers, no one could quantify how much Lincoln ate. Additionally, Guajardo testified that Lincoln would have consumed the burrito either in the elimination phase or "at the very tail end" of the absorption phase and discounted that it would have had a large effect on his analysis.

Guajardo explained that Lincoln's weight was "important in the calculation." He used 190 pounds as Lincoln's weight, as this was the information provided by the State.[6] However, conflicting evidence appears in the record concerning Lincoln's weight. Detective Avalos testified that Lincoln weighed approximately 250 pounds. But medical records from Lincoln's visit to the hospital on July 13 indicate that Lincoln weighed 70 kg, or approximately 155 pounds. Regardless, Guajardo testified that while weight is important, it is but one factor among many that he considers when performing an extrapolation.

In sum, here, Guajardo knew many of the relevant factors detailed in *Mata*. *See* 46 S.W.3d at 916. He knew Lincoln's gender, how much he had to drink, what he had to drink, the duration of the drinking spree, the time of the last drink, and approximately how much Lincoln ate during and after the drinking. *See id.* Though there were some relevant factors that Guajardo did not know with certainty, such as Lincoln's weight, "not every single personal fact about the defendant must be known to the expert in order to produce an extrapolation with the appropriate level of reliability." *See id.* Viewing Guajardo's

---

[6] The State implied through its questioning that Lincoln's driver's license lists his weight as 190 pounds. However, the image of Lincoln's driver's license that appears in the record is partially obscured and does not list Lincoln's weight.

testimony in the light most favorable to the trial court's decision to admit it, we conclude that it was demonstrated by clear and convincing evidence that the underlying theory was valid, the technique applying the theory was valid, and that the technique was properly applied in this case. *See Bigon*, 252 S.W.3d at 367; *Kelly*, 824 S.W.2d at 574; *see also Corley*, 541 S.W.3d at 271 (concluding that expert's testimony was sufficiently reliable when two breath tests were taken approximately one hour after the driving and the expert knew: "(1) the amount of food and time appellant last ate, (2) the time of appellant's last drink, and (3) the time and results of appellant's breath tests").

Even if the trial court erred by permitting Guajardo to extrapolate on Lincoln's BAC at the time of the accident, such an error was rendered harmless by Tucker's testimony. *See Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App. 1994) ("Because the testimony at trial of Macias and Diaz proved the same facts that the State sought to admit through the testimony of Price, we conclude that Price's erroneously admitted hearsay testimony did not harm appellant."); *see also* TEX. R. APP. P. 44.2 (setting forth the standard for reversible error in criminal cases). Lincoln suggests that Tucker's testimony "is testimony that is nice to know, but is probative of nothing relative to Lincoln that evening," because Tucker was limited to hypotheticals rather than the facts of this case. But the hypotheticals on which Tucker opined were the same as those present in this case, and Lincoln does not challenge the admission of Tucker's resulting conclusion on appeal. The trial court did not instruct the jury that it could not consider Tucker's testimony as probative of Lincoln's BAC on the night in question. And, in fact, the jury may have credited Tucker's testimony that an average person who consumed their final drink at 9:30 p.m. and had a

BAC of 0.084 at 12:30 a.m. would be over the legal limit at 11:00 a.m. *See Tillman v. State*, 354 S.W.3d 425, 441 (Tex. Crim. App. 2011) (explaining that expert testimony on hypothetical scenarios that mirror the facts of the underlying case can "assist the trier of fact"); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981) ("The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given their testimony.").

We overrule this sub-issue.

### 2. "Beyond a Reasonable Doubt" versus "Clear and Convincing Evidence"

By his second sub-issue, Lincoln argues that the admission of Guajardo's extrapolation testimony rose to the level of constitutional error because it permitted a conviction based on evidence that did not establish his guilt beyond a reasonable doubt.[7] Specifically, Lincoln argues that certain expert testimony should only be admitted if the underlying science is proved reliable beyond a reasonable doubt, rather than by clear and convincing evidence. *Cf. Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017) (providing that expert testimony need only be shown to be sufficiently reliable and relevant "by clear and convincing evidence" to be admitted). Lincoln further argues that because the admission of expert testimony was only governed by a clear and convincing standard, rather than a beyond a reasonable doubt standard, Lincoln's conviction cannot stand, as the only evidence of his intoxication was Guajardo's testimony, which was not proven reliable beyond a reasonable doubt. However, we have already concluded that other

---

[7] Lincoln acknowledges elsewhere in his brief that "[t]he erroneous admission of retrograde extrapolation testimony is non-constitutional error." *See* TEX. R. APP. P. 44.2(b).

evidence supports Lincoln's conviction. Moreover, we have also already concluded that the trial court did not err in admitting Guajardo's extrapolation testimony; accordingly, we need not decide whether a theoretical error in admitting that testimony would be of a constitutional dimension. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

In any event, it is not our place to deem well-settled precedent by our parent court unconstitutional. *See Wolfe*, 509 S.W.3d at 335 (applying clear and convincing evidence standard to the admission of expert testimony); *Kelly*, 824 S.W.2d at 574 (same); *see also Phelps v. State*, 532 S.W.3d 437, 443 n.6 (Tex. App.—Texarkana 2017, pet. ref'd) ("Under vertical stare decisis, lower courts have practically no discretion to revisit a case issued by a higher court regardless of whether it involves a constitutional, common-law, or statutory question."). We overrule Lincoln's second issue.

## IV.  CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P 47.2(b).

Delivered and filed on the
1st day of February, 2024.

21